**FILED**
**CLERK**

8/8/2016 9:49 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

SAMUEL H. PROVISERO,

         Plaintiff,

   -against-

CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration,

         Defendant.

-------------------------------------------------------------------x

**Memorandum of**
**Decision & Order**
14-cv-1830 (ADS)

<u>APPEARANCES:</u>

**Christopher J. Bowes, Esq.**
*Attorney for the Plaintiff*
54 Cobblestone Drive
Shoreham, NY 11786

**United States Attorney's Office, Eastern District of New York**
*Attorneys for the Defendant*
610 Federal Plaza, 5th Floor
Central Islip, NY 11722
      By:    Vincent Lipari, Assistant U.S. Attorney

**SPATT, District Judge:**

On March 19, 2014, the Plaintiff Samuel H. Provisero (the "Plaintiff") commenced this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405 *et seq.*, challenging a final determination by the Defendant Acting Commissioner of Social Security Carolyn W. Colvin (the "Defendant" or "Commissioner"), that he is ineligible to receive Social Security disability insurance benefits.

Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(c), for judgment on the pleadings. For the reasons that follow, the Plaintiff's motion is granted in part and denied in part; the Commissioner's motion is granted in part and denied in part; and this matter is remanded for additional administrative proceedings.

1

After serving in the Army during the Vietnam War, the Plaintiff worked as a crane operator for approximately 36 years.  Between September 2001 and May 2004, he operated a crane at the World Trade Center recovery and cleanup site.  The Plaintiff continued in this line of work until May 2006, when he was injured in a fall from his crane and required stitches.  He returned to work for only two weeks after this incident, eventually claiming that that he was disabled due to asthma, sleep apnea, and depression.

On May 18, 2007, the Plaintiff applied for Social Security disability insurance benefits, alleging a disability onset date of May 1, 2006.  On or about September 7, 2007, the Social Security Administration ("SSA") denied his application.

On reconsideration, including a hearing held on May 7, 2008, Administrative Law Judge Seymour Raynor (the "ALJ") agreed with the SSA's initial determination.  In particular, in a June 6, 2008 written opinion, the ALJ concluded that, to the extent the Plaintiff was still capable of performing his past work as a crane operator, he was not disabled for purposes of the Act.

On August 29, 2009, the Appeals Council denied a request for further review of the ALJ's determination, making the ALJ's decision the final decision of the Commissioner.

On October 29, 2009, the Plaintiff filed a civil appeal in the Eastern District of New York, seeking district court review of the ALJ's decision.  The matter was assigned to United States District Judge Joanna Seybert, who, by Memorandum & Order dated February 15, 2012, remanded the matter to the ALJ for additional administrative proceedings.

In light of Judge Seybert's order, on August 24, 2012, the Appeals Council issued an Affirmation and Order vacating the ALJ's June 6, 2008 decision and officially remanding the matter for further proceedings.  However, the Appeals Council noted that, on December 3, 2010, while his civil appeal was on submission, the Plaintiff had actually filed a second application for Social

Security disability benefits. Apparently, based on the medical evidence submitted in support of the second application, the SSA determined that the Plaintiff was disabled as of June 7, 2008.

Therefore, with respect to the first application, the sole issue to be addressed on remand was whether the Plaintiff was disabled during the period of time from May 1, 2006, *i.e.*, the alleged disability onset date, to June 7, 2008, *i.e.*, the date the SSA acknowledged that he was disabled for purposes of the second application. For purposes of this opinion, the period of time from May 1, 2006 to June 7, 2008 is defined as the "Relevant Time Period."

Following another hearing held on January 22, 2013, the ALJ concluded that the Plaintiff was not disabled during the Relevant Time Period. In particular, the ALJ found that, although the Plaintiff could no longer perform his past work as a crane operator, he nevertheless maintained the residual functional capacity ("RFC") to perform the full range of "medium work," as that term is defined in 20 C.F.R. 404.1567(c). Given his age, education, and work experience, the ALJ concluded that he could perform jobs that existed in significant numbers in the national economy.

On January 31, 2014, after receiving written objections to the ALJ's decision from the Plaintiff, the Appeals Council denied administrative review.

On March 19, 2014, the Plaintiff commenced this civil appeal.

A.      **The Non-Medical Evidence**

As noted above, the Plaintiff testified about his alleged disabilities in two separate hearings before the ALJ.

1.      **The May 7, 2008 Hearing**

On May 7, 2008, the Plaintiff appeared by counsel and testified that he had been under active medical treatment for asthma and depression since approximately May 16, 2006, which was also the last date that he worked. At the time of the hearing, the Plaintiff was taking multiple medications daily, including Ibuprofen, Spiriva, Prevacid, Lamictal, and Mirtazapine.

The Plaintiff testified that in May 2006 he fell off of his crane and sustained injuries that required stitches. He was placed on "light duty" for approximately two weeks after this incident, and then stopped working completely.

With regard to his mental condition, the Plaintiff testified that he suffered from depression and experienced "fears of everything," including "working," "seeing people," and "being social." He stated if he stopped taking his antidepressants, he would not be "a very good, useful person" and would not be "a very social person." However, at the time of the hearing, the Plaintiff admittedly was under no stress or strain; stated that he "still can function and work with people"; and indicated that his prescribed medications "seem[ed] to be working."

In fact, at the May 7, 2008 hearing, the Plaintiff stated that his asthma, and not his depression, was "the problem."

In this regard, the Plaintiff testified that he had become progressively inactive due to shortness of breath. For example, he stated that he loses his breath and feels lightheaded after walking one block; after climbing the steps to his house; or after doing "any type of work." In this regard, he testified that it could take him half a day to wash his car because he has to take so many breaks.

Nonetheless, the Plaintiff testified that his wife suffers from Parkinson's disease, and so, although they had a cleaning service clean their home once a week, the Plaintiff assumed many of the household chores, such as "cooking and washing." He also testified that he does the shopping for the household; does the laundry; does the dishes; takes out the garbage; sweeps and mops the floors; and sometimes makes the beds. He stated that he is unable to perform these chores "all at once," and instead, has to complete them in steps. Still, he testified that he is able to shower by himself, dress himself, button buttons, buckle a belt, zip a zipper, tie a bow, comb his hair, shave his face, and put on a coat. He can open doors and drawers, and can eat with a fork and knife. He uses a telephone

and computer, and can write with a pen. He testified that he drives; goes to the bank and the post office; uses ATMs; and pays the bills.

He does not walk with a cane and estimated that he can stand for up to an hour. He also stated that he can sit uninterrupted for "a long time," and can lift 50 or 60 pounds at one time, although he is out of breath after doing so. He can lift about ten pounds without respiratory symptoms.

The Plaintiff testified that he had not been hospitalized or visited the emergency room for any asthma-related conditions. However, he developed two lung infections that required treatment with antibiotics in 2007 and 2008.

Also, the Plaintiff testified that, after returning home from his military service in Vietnam, he became addicted to heroin. However, he has not used drugs since approximately 1975. The Plaintiff also struggled with alcohol abuse until approximately 1997, but now attends Alcoholics Anonymous meetings and does not drink.

2. **The January 22, 2013 Hearing**

The Plaintiff testified before the ALJ for a second time on January 22, 2013.

He testified that during the Relevant Time Period, he felt unable to work because he became dizzy while operating the crane and believed himself to be a danger to himself and others. He explained that operating a crane required the simultaneous manipulation of hand levers and foot pedals. In addition, his job responsibilities required him to climb stairs and ladders, which rendered him weak and tired.

The Plaintiff testified that, during the Relevant Time Period, he spent his time on an average day babysitting his grandchildren, and doing light housework and cooking. He testified that he consumes oxygen during the day to "pick up a little bit" and treats his sleep apnea with a Bilevel Positive Airway Pressure ("BiPAP") machine.

**B.     The Medical Evidence**

**1.     Treating Physician Stanley L. Rabinowitz, M.D.**

The Plaintiff first began seeing Dr. Rabinowitz, a pulmonologist affiliated with Island Pulmonary Associates, PC, in December 2004.   In his earliest available treatment notes, Dr. Rabinowitz noted that the Plaintiff, then 57 years old, experienced wheezing and severe dyspnea on exertion, *i.e.*, shortness of breath and/or difficulty breathing.   Dr. Rabinowitz also noted that the Plaintiff had been smoking a pack of cigarettes per day for 30 years.

During a December 29, 2004 visit, Dr. Rabinowitz noted that the Plaintiff's chest was clear to auscultation, but reported that he claimed to be "addicted" to Afrin, a medicated nasal spray, due to a severe nasal obstruction.   He also observed that the Plaintiff suffered from significant gastroesophageal reflux disease ("GERD"), which woke him up at night, and he had occasional difficulty swallowing, or dysphasia.

A January 2005 pulmonary function test showed a mild obstructive ventilatory impairment without significant response to inhaled bronchodilators.   During a follow-up visit in March of that year, Dr. Rabinowitz again observed that the Plaintiff's throat and chest were clear, with no significant murmurs, gallops, or rubs.   He diagnosed the Plaintiff with "World Trade Center syndrome," which presented in the form of restrictive airways disease, acid reflux, nasal congestion, post-traumatic stress disorder, and depression.   Dr. Rabinowitz prescribed Prevacid for his GERD, Spiriva to control his pulmonary symptoms, and recommended that he quit smoking.

In December 2006, Dr. Rabinowitz reported that the Plaintiff had developed symptoms suggestive of sleep apnea, including snoring, frequent awakening, and daytime sleepiness.   Dr. Rabinowitz referred him for a sleep study and another pulmonary function study.   However, upon physical examination, the Plaintiff's throat and chest were clear.   Dr. Rabinowitz continued the Plaintiff on Prevacid and prescribed Combivent, another inhalant used to control pulmonary symptoms.

During a follow-up visit on December 6, 2006, Dr. Rabinowitz noted that the results of the pulmonary function study actually showed improvement from the Plaintiff's similar January 2005 study. In particular, the results were mostly normal, showing only a "very minimal obstructive ventilatory impairment."

Also, the results of the sleep study revealed obstructive sleep apnea, for which Dr. Rabinowitz referred the Plaintiff for a continuous positive airway pressure ("C-PAP") titration study.

On February 13, 2007, Dr. Rabinowitz declared the Plaintiff to be "generally improved," specifically noting that a previous bout of bronchitis had resolved. Also, he noted that the Plaintiff's sleep apnea had been "successfully titrated" during the C-PAP titration study, meaning that the study successfully determined the amount of air pressure needed to prevent the Plaintiff's airways from becoming blocked in his sleep. Thus, Dr. Rabinowitz prescribed a home-use BiPAP machine, calibrated to allow the Plaintiff to control his breathing at night.

Three days later, on February 16, 2007, on a form submitted to the New York State Workers' Compensation Board, Dr. Rabinowitz indicated that the Plaintiff was not disabled from performing his regular duties. *See* R. 387 (pertaining to 2/13/07 office visit).

The Plaintiff was not seen by Dr. Rabinowitz again until May 16, 2007. However, on March 8, 2007, Dr. Rabinowitz filed several additional forms with the Workers' Compensation Board purportedly relating to prior office visits dating back to December 2006. Of relevance, despite having completed the February 16, 2007 form within days of treating the Plaintiff and indicating that he was *not* disabled, in each of these new backdated forms, Dr. Rabinowitz indicated that the Plaintiff *was*, in fact, partially disabled, and had been unable to perform his regular duties since December 2006. *See* R. 381 (pertaining to 12/4/06 office visit); R. 382-83 (pertaining to 12/6/06 office

visit); R. 384 (pertaining to 12/12/06 office visit); R. 385 (pertaining to 1/23/07 office visit); R. 386 (pertaining to 2/2/07 office visit).

In any event, during the May 16, 2007 follow-up visit, Dr. Rabinowitz reported that the Plaintiff had not been using his BiPAP machine as directed, and noted a continued cough and occasional wheeze. Dr. Rabinowitz added Albuterol spray, a bronchodilator, to his usual course of medications.

Two days later, on May 18, 2007, Dr. Rabinowitz completed another form for the Workers' Compensation Board, in which he indicated that the Plaintiff was partially disabled and unable to perform his regular duties. *See* R. 388 (pertaining to 5/16/07 office visit).

Several months later, on August 8, 2007, Dr. Rabinowitz noted that the Plaintiff appeared to be doing "generally well," as he had begun using his BiPAP machine regularly and was experiencing less daytime sleepiness. However, the Plaintiff still experienced shortness of breath upon moderate exertion and needed to pace himself in order to complete the activities of daily living. Nevertheless, his throat and chest were clear to auscultation, and a recent pulmonary function test showed no evidence of significant obstructive ventilatory impairment or restriction.

On October 31, 2007, Dr. Rabinowitz diagnosed the Plaintiff with acute bronchitis and an acute upper respiratory infection and prescribed a course of antibiotics. One week later, on November 7, 2007, Dr. Rabinowitz completed a form for the Workers' Compensation Board, in which he again indicated that the Plaintiff was partially disabled and unable to perform his regular duties. *See* R. 377 (pertaining to 10/31/07 office visit).

On March 25, 2008, Dr. Rabinowitz diagnosed "acute tracheobronchitis with purulent sputum," which, apparently, describes a condition characterized by an inflammation in the Plaintiff's air passages that caused certain matter, namely, pus or mucus, to be expectorated – that is, coughed up or spit out. *See* STEDMAN'S MEDICAL DICTIONARY 1681-82 & 1851 (27th ed. 2000). Again, the Plaintiff was placed on a course of antibiotics in addition to his usual medications, and was also

prescribed a steroid treatment known as a Medrol dose pack to reduce the bronchial inflammation. Also, again, on March 31, 2008, Dr. Rabinowitz completed a form for the Workers' Compensation Board, in which he again indicated that the Plaintiff was partially disabled and unable to perform his regular duties. *See* R. 380 (pertaining to 3/25/08 office visit).

In a July 16, 2008 narrative report – which, the Court notes, was created after the Relevant Time Period – Dr. Rabinowitz opined that the Plaintiff's prognosis for further improvement was poor, and, for the first time, concluded that he was "completely disabled due to severe World Trade Center Syndrome." Dr. Rabinowitz noted that the Plaintiff had stopped smoking cigarettes sometime within the past year.

Dr. Rabinowitz created a second narrative report on or about April 12, 2010, in which he concluded that the Plaintiff was "completely disabled from returning to work to his typical construction site and as a crane operator." Further, Dr. Rabinowitz opined that the Plaintiff was "completely disabled for *any* occupation in the construction industry and he is unable to tolerate extremes in temperatures or inhalation of any pulmonary irritants." He noted that, in order to control the Plaintiff's respiratory symptoms, he required daily doses of Prevacid, Spiriva, and Albuterol, as well as nightly use of the BiPAP machine. He also noted that the Plaintiff had lost approximately 40 pounds dieting, but still experienced shortness of breath upon exertion.

### 2. Consultative Examiner Dr. Jonathan Wahl, M.D.

On referral from the SSA's Division of Disability Determination, the Plaintiff visited Dr. Wahl on July 3, 2007 for a consultative internal medicine examination. The associated report indicates that the Plaintiff, then 60 years old, stood six feet tall and weighed 261 pounds. His chief complaint was mental, not physical: "Depression with focus of attention, concentration deficits, sleep/appetite/mood changes." Dr. Wahl noted that the Plaintiff also had asthma, which was diagnosed in 2002, and which was asymptomatic with no known exacerbating or alleviating factors.

At the time of this visit, the Plaintiff was taking the medications prescribed by Dr. Rabinowitz – namely, Prevacid, Spiriva, Albuterol, and the BiPAP machine – as well as Lamictal, Remeron, and Prozac for depression and mood swings. He gave his activities of daily living as cooking, cleaning, laundry, shopping, showering, bathing, dressing, and grooming, all without help. He also indicated that he spent his time watching television, listening to the radio, and reading.

Upon physical examination, Dr. Wahl noted that the Plaintiff was in no apparent distress; had a normal gait; was able to walk on his heels and toes without difficulty; and could squat fully. He required no assistive devices to ambulate; needed no help changing clothes for his examination; and could get on and off the exam table without assistance. He rose from a seated position without difficulty.

Dr. Wahl observed the Plaintiff's nose and throat to be normal, and his chest to be clear with normal percussion. He diagnosed asthma, depression, and social phobia, all by history, and opined that the Plaintiff would benefit from a psychological evaluation. He recommended that the Plaintiff avoid "intensely strenuous exercise," as well as "environments known to have dust and respiratory irritants." Dr. Wahl identified no other occupational limitations or restrictions.

3.     **Consultative Examiner Judith Shaw, Ph.D.**

On July 12, 2007, again on referral from the SSA, the Plaintiff visited Dr. Shaw for a psychological evaluation. The associated report indicates that he drove himself the fifteen miles to the appointment; that he was pleasant and cooperative with good social skills; that he maintained appropriate eye contact; that he was neatly dressed and appeared well-groomed; and that he appeared to be of average intellectual ability, demonstrating fair insight and good judgment. When asked what problems affected his ability to work, the Plaintiff stated that his "asthma is the important thing and the depression." In this regard, he stated that he experiences fear and prefers not to be around other people.

Dr. Shaw noted that the Plaintiff had no history of psychiatric hospitalizations, but that he had previously received unspecified treatment from a Dr. Malanmud; and that since 2002 he had been treated bimonthly by a Dr. Reiben. She also noted his prescriptions for antidepressants, including Remeron, Prozac, and Lamictal.

Dr. Shaw reported that the Plaintiff claimed to have felt depressed for four years, although he could not identify a cause of his depression and stated that he has no reason to be depressed. Similarly, he claimed to feel anxious, but could neither identify any symptoms of anxiety that he experienced, nor specify anything in his life about which he felt anxious. He described being subject to irritability and becoming socially withdrawn, but reported improvement with the aid of medication.

Relevant here, with respect to the Plaintiff's vocational functional capacity, Dr. Shaw opined that:

> [The Plaintiff] should be able to follow and understand simple directions and instructions, perform simple tasks independently, maintain his attention and concentration at least for short periods of time, maintain a regular schedule, learn new tasks, perform complex tasks independently, make basic appropriate decisions, relate adequately with others and appropriately deal with stress. . . . The results of the present evaluation appear to be consistent with some psychiatric problems but in itself this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

Dr. Shaw's diagnoses included depressive disorder and asthma. Accordingly, she recommended continuing his then-current psychiatric treatment and suggested cognitive behavioral psychotherapy "to help him acquire some specific techniques for the more effective management of feelings of depression and anxiety."

4.      **Non-Examining Physician E. Gagan, M.D.**

On August 7, 2007, again on referral from the SSA's Division of Disability Determinations, the Plaintiff's medical records were evaluated by a consulting psychiatrist identified only as "E. Gagan, M.D." for the purpose of furnishing an opinion on the Plaintiff's residual functional

capacity (previously defined as "RFC"). The Court notes that Dr. Gagan did not personally examine the Plaintiff.

Dr. Gagan concluded that the Plaintiff's file supported diagnoses of depressive disorder and opioid dependence, which resulted in only mild restrictions on his activities of daily living; mild difficulties maintaining social functioning; and mild difficulties maintaining concentration, persistence, or pace. In sum, Dr. Gagan concluded that the Plaintiff was under no significant occupational limitations in his ability to understand, remember, and carry out basic instructions and work-related procedures. Her only remarkable findings were moderate limitations on the Plaintiff's ability to carry out "detailed" instructions and respond appropriately to changes in the work setting.

As for Dr. Gagan's assessment of the Plaintiff's RFC, she noted that although he claimed to be depressed, the SSA had been unable to obtain records from his treating psychiatrist, and the findings of Dr. Shaw, the consulting psychiatrist, were unremarkable. Dr. Gagan also noted the Plaintiff's asthma, but observed that his activities of daily living were "good" and that he would nevertheless be able to understand, remember, and carry out simple instructions; maintain concentration, pace, and persistence; and interact in and adapt to a workplace.

**C.    The February 6, 2013 Decision of the ALJ**

In this action, the Plaintiff challenges the ALJ's findings contained in a February 6, 2013 written decision (the "Underlying Decision").

In the Underlying Decision, the ALJ found that, during the Relevant Time Period, the Plaintiff suffered from asthma, depression, and anxiety disorders, which constitute severe, medically-determinable impairments that may cause more than minimal limitations on the Plaintiff's ability to perform basic work activities.

Nevertheless, the ALJ concluded that the Plaintiff retained the RFC to perform the full range of medium work. In reaching this conclusion, the ALJ determined that the Plaintiff could sit and/or

stand and/or walk for up to six hours in an eight-hour day; and that he could lift and/or carry up to 25 pounds frequently, and up to 50 pounds occasionally.

The ALJ accorded little weight to the conclusion expressed by Dr. Rabinowitz in his narrative reports that the Plaintiff was "completely disabled":

> In Workers' Compensation Attending Doctors' Reports, submitted by Dr. Rabinowitz and Island Pulmonary Associates, for the relevant time period, the claimant was felt to be unable to perform regular duties of work and had a "partial" impairment. In correspondence dated July 16, 2008, after the relevant time period, Dr. Rabinowitz briefly summarized the treatment provided to the claimant and opined that he remains "completely disabled" due to severe World Trade Center Syndrome. To the extent that Dr. Rabinowitz opined that the claimant was precluded from all work during the relevant time period, such an opinion is <u>not</u> consistent with the treatment records, which for the relevant period include physical examinations that were generally unremarkable. During the period at issue, the claimant usually had normal oximetry [a method of assessing lung function by determining blood oxygen levels] and his chest was clear to auscultation. Pulmonary function tests revealed normal to mild findings. As for sleep apnea, on August 8, 2007, the claimant was "doing well" with regularly use [*sic*] of the BiPAP machine. There is a suggestion that the claimant is able to perform activities of daily living with pacing. There are no restrictions or limitations noted in the treatment record for the period at issue. Workers' compensation reports suggest that the claimant is "partially," not completely disabled. The opinion offered is conclusory, providing little explanation of the evidence relied upon in forming the opinion. Further, the opinion is without substantial support from other evidence in the record. Therefore, the undersigned accords limited weight to the opinion of Stanley Rabinowitz, M.D.

R. 417.

By contrast, the ALJ accorded "considerable weight" to the opinion of Dr. Wahl, whose opinion that the Plaintiff should only avoid respiratory irritants and intensely strenuous exercise the ALJ found to be consistent with the Plaintiff's history and the results of his physical examination. In particular, Dr. Wahl noted a history of asthma, which was asymptomatic at the time of the visit, and the ability to independently perform a "wide range" of activities of daily living. As noted above, his clinical findings included no evidence that the Plaintiff was in distress; had a clear chest with normal percussion and diaphragmatic motion; had no musculoskeletal or neurologic deficits; had full bilateral grip strength; and had intact hand and finger dexterity.

Further, the ALJ accorded "great weight" to the opinion of Dr. Shaw, who concluded that the Plaintiff's psychiatric problems were not sufficient to interfere with his ability to function on a daily basis. The ALJ found this opinion to also be consistent with the Plaintiff's reported symptoms and Dr. Shaw's clinical findings, including the following, which the Court also described above:

> During the examination, the claimant had an appropriate appearance, adequate speech, a coherent and goal[-]directed thought process, full range of affect, neutral mood, mildly impaired attention and concentration, intact memory, average cognitive functioning, fair insight and good judgment. . . . The claimant socializes with family, helps his wife, who has Parkinson's disease, and takes his wife to go see their children. Dr. Shaw opined that the claimant should be able to follow and understand simple directions and instructions, perform simple tasks independently, maintain his attention and concentration at least for short periods of time, maintain a regular schedule, learn new tasks, perform complex tasks independently, make basic appropriate decisions, relate adequately with others and appropriately deal with stress.

R. 417-18.

After weighing the evidence in the record, including the ALJ's own assessment of the Plaintiff's testimony over the course of two hearings, he concluded that the Plaintiff's statements concerning the intensity, persistence, and limiting effects of his physical and mental impairments were not entirely credible.

Therefore, given the Plaintiff's age – 58 to 61 years old during the Relevant Time Period; his high school education; his ability to communicate in English; his prior work history; and his capacity to perform medium work, the ALJ determined that there were jobs that existed in significant numbers in the national economy that the Plaintiff could have performed. According to the ALJ, this remained true despite the existence of certain occupational limitations, namely, the need to avoid respiratory irritants, perform low stress work, and limit contact with supervisors, coworkers, and the public. Accordingly, the ALJ concluded that the Plaintiff was not disabled during the Relevant Time Period for purposes of entitlement to Social Security disability benefits.

D.      The Present Appeal

In this appeal, the Plaintiff sets forth a twofold argument for overturning the ALJ's conclusion that he was not disabled during the Relevant Time Period.

First, the Plaintiff contends that he lacked the so-called "exertional" capabilities needed to perform medium work. In this context, "exertional" relates to "the 'strength' requirements of jobs," *Sergenton v. Barnhart*, 470 F. Supp. 2d 194, 202 (E.D.N.Y. 2007), such as the Plaintiff's ability to sit, stand, walk, lift, carry, push, and pull, *see* 20 C.F.R. § 404.1545(b). According to the Plaintiff, the exertional limitations of his impairments preclude the performance of medium work. Allegedly, this remains true despite the documentary and testimonial evidence about the Plaintiff's ability to perform the activities of daily living. He contends that the ALJ's contrary conclusion lacked a substantial evidentiary basis.

Second, the Plaintiff contends that he has significant "nonexertional" limitations, which further limit his capacity to perform medium work. "Non-exertional limitations are those that do *not* implicate the strength required to perform a particular task, such as mental, sensory, and skin impairments that may impose environmental restrictions on where a person may work." *Gonzalez v. Astrue*, No. 06-cv-5403, 2008 U.S. Dist. LEXIS 75722, at *24 (E.D.N.Y. Sept. 30, 2008) (emphasis supplied). In this regard, the Plaintiff contends that the ALJ failed to properly consider his nonexertional limitations – namely, his need to avoid dust and respiratory irritants; to perform low stress work; and to limit contact with coworkers, supervisors, and the public – in determining that there were jobs that existed in significant numbers in the national economy that the he could have performed during the Relevant Time Period.

The Commissioner contends that these arguments lack merit; that the ALJ applied the proper legal standards; and that substantial evidence in the record supports her denial of benefits.

## II.    DISCUSSION

### A.    The Standard of Review

It is well-settled that a district court may set aside the Commissioner's determination that a claimant is not disabled where the factual findings underlying the decision are not supported by substantial evidence or if the decision is based on legal error. *See Bitz v. Colvin*, No. 14-cv-7453, 2016 U.S. Dist. LEXIS 52799, at *10 (E.D.N.Y. Apr. 20, 2016) (Spatt, J.) (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)); *see also Koffsky v. Apfel*, 26 F. Supp. 475, 478 (E.D.N.Y. Nov. 16, 1998) (Spatt, J.) (observing that "[j]udicial review of the denial of disability benefits is narrow" and "[t]he Court will set aside the Commissioner's conclusions only if they are not supported by substantial evidence in the record as a whole or are based on an erroneous legal standard").

Thus, "the reviewing court does not decide the case *de novo*." *Pereira v. Astrue*, 279 F.R.D. 201, 205 (E.D.N.Y. 2010).   Rather, "the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive," *id.*, and "the only issue before the Court is whether the ALJ's finding that [the] Plaintiff was not eligible for benefits was 'based on legal error or not supported by substantial evidence,' " *id.* (quoting *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999)); *see Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (observing that the "substantial evidence" standard is "very deferential" to the Commissioner, and allows courts to reject the ALJ's findings " 'only if a reasonable factfinder would *have to conclude otherwise*' " (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994) (emphasis in original)).   This standard applies not only to factual determinations, but equally to inferences and conclusions drawn from such facts." *Pena v. Barnhart*, No. 01-cv-502, 2002 U.S. Dist. LEXIS 21427, at *20 (S.D.N.Y. Oct. 29, 2002) (citing *Levine v. Gardner*, 360 F.2d 727, 730 (2d Cir. 1966)).

In this context, " '[s]ubstantial evidence' means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Burgess*,

537 F.3d at 128 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)). An ALJ's findings may properly rest on substantial evidence even where he or she fails to "recite every piece of evidence that contributed to the decision, so long as the record 'permits [the Court] to glean the rationale of [his or her] decision.' " *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). This remains true "even if contrary evidence exists." *Mackey v. Barnhart*, 306 F. Supp. 337, 340 (E.D.N.Y. 2004) (citing *DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) for the proposition that an ALJ's decision was affirmed where there was substantial evidence for both sides).

Further, the Court is prohibited from substituting its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review. *See Koffsky*, 26 F. Supp. at 478 (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)).

**B.    As to Whether Substantial Evidence Supported the ALJ's Determination that the Plaintiff Retained the Functional Capacity to Perform the Full Range of Medium Work**

As noted above, the first issue in this case is whether substantial evidence in the record supported the ALJ's conclusion that the Plaintiff's exertional limitations did not prevent him from performing the full range of medium work during the Relevant Time Period.

### 1.    The Applicable Law

"A claimant is disabled under the Social Security Act when he is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.' " *Felix v. Astrue*, No. 11-cv-3697, 2012 U.S. Dist. LEXIS 102949, at *16-*17 (E.D.N.Y. July 25, 2012) (quoting 42 U.S.C. § 423(d)(1)(A)).

Relevant here, under the five-step sequential framework promulgated by the SSA, a claimant is not disabled if, given his or her impairment, there nevertheless exists another type of work that he or she can do. *See Burgess*, 537 F.3d at 120 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir.

2003)).   In this regard, the Commissioner bears the burden of showing that, "in light of the claimant's RFC, age, education, and work experience, the claimant is 'able to engage in gainful employment within the national economy.' " *Felix*, 2012 U.S. Dist. LEXIS 102949, at *19 (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997)).

Usually, the Commissioner meets her burden by resorting to the applicable Medical-Vocational guidelines, commonly referred to as the "grids" (hereinafter, the "Grids").   *See Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2).   "The [G]rids 'take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience,' " *Rosa*, 168 F.3d at 78 (quoting *Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996)), and, "[b]ased on these considerations, . . . indicate whether the claimant can engage in any substantial gainful work existing in the national economy." *Id.*

"The [G]rids divide work into five categories based on the exertional requirements of the different jobs." *Samuels v. Barnhart*, No. 01-cv-3661, 2003 U.S. Dist. LEXIS 8173, at *35-*36 (S.D.N.Y. May 14, 2003).   "Specifically, the [G]rids divide work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." *Id.* at *36 (citing 20 C.F.R. § 416.969a(a)); *see Rios v. Comm'r*, No. 12-cv-5102, 2015 U.S. Dist. LEXIS 69855, at *20-*21 n.1 (E.D.N.Y. May 29, 2015) (noting that "[a]n exertional limitation occurs '[w]hen the limitations and restrictions imposed by [a claimant's] impairment(s) and related symptoms, such as pain, affect only [his] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)" (citation omitted)).

In this case, the ALJ used the SSA's five-step methodology to determine that, based on application of the Grids, the Plaintiff was capable of performing the full range of medium work during the Relevant Time Period. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, R. 201.15.   The SSA has

explained that the exertional demands of medium work require lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. *See* Social Security Ruling ("SSR") 83-10, *available at* 1983 SSR LEXIS 30, at *15-*16 (citing 20 C.F.R. § 404.1567(c)).   In this context, " 'frequent' means occurring from one-third to two-thirds of the time." *Id.* at *14.

Further, "[a] full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds." *Id.* at *15.  "Sitting may occur intermittently during the remaining time," but "[u]se of the arms and hands is necessary to grasp, hold, and turn objects." *Id.*

### 2.    There is Substantial Evidence that the Plaintiff Could Perform the Exertional Demands of Medium Work

It is the opinion of the Court that substantial evidence in the record supports the ALJ's conclusion that the Plaintiff retained the functional capacity to meet the exertional demands of medium work during the Relevant Time Period.

On May 7, 2008, approximately two years after the alleged disability onset date, the Plaintiff admitted that he could stand uninterrupted for an hour; that he could remain seated for "a long time"; that he could lift 50 or 60 pounds at one time; and that he could lift about ten pounds without any respiratory symptoms.  This uncontroverted testimony is consistent with the ALJ's findings, and none of the objective medical records compel a contrary result.

In particular, at no point during the Relevant Time Period did Dr. Rabinowitz, the Plaintiff's treating physician, render an opinion that the results of clinical testing were consistent with a complete disability.  Nor did he identify any relevant occupational restrictions or limitations.  Nor is there any evidence that any physician, treating or otherwise, limited the Plaintiff's ability to lift and/or carry any amount of weight, or to sit and/or stand for any amount of time. On the contrary, in the Court's view, the record as a whole lends substantial support for the ALJ's RFC determination.

Although the Plaintiff undeniably suffered from asthma, physical examinations at the hands of Dr. Rabinowitz were consistently unremarkable, with his chest and throat regularly appearing clear, and his symptoms well-controlled by conservative treatment with prescription bronchodilators. Although he developed two lung infections in as many years, the evidence shows that they were successfully treated with antibiotics and did not result in persistent symptoms. Similarly, occasional bouts of bronchitis were successfully resolved without complication.

With respect to sleep apnea, the record demonstrates that this condition was also well-controlled by home use of a BiPAP machine, and did not generate any consistently remarkable symptoms during the Relevant Time Period. In fact, the Plaintiff was not diagnosed with symptoms of sleep apnea until December 2006, namely, seven months after the alleged disability onset date. As recently as May 2007, he had failed to use the BiPAP machine as directed by Dr. Rabinowitz. It was not until August 2007 that the Plaintiff actually followed his pulmonologist's recommendations in this regard, and subsequent treatment records indicate that he began doing "generally well" and experiencing less daytime sleepiness as a result.

As for the diagnostic evidence, although pulmonary function testing from before the Relevant Time Period had showed a mild respiratory impairment, Dr. Rabinowitz noted that the results of subsequent testing showed improvement, and were mostly normal, except for a "very minimal" obstruction for which it appears no additional treatment was recommended. Again, in February 2007, Dr. Rabinowitz declared the Plaintiff to be "generally improved."

The Plaintiff takes issue with the ALJ's observation that, "[d]uring the period at issue, the claimant usually had normal oximetry and his chest was clear to auscultation." R. 417. In particular, quoting from a publication entitled *Social Security Disability Tests*, the Plaintiff asserts, and the Commissioner does not dispute, that "[n]ormal oximetry reading levels are from 95-99 percent." *See* Pl. Br. at 19. However, the evidence in the record shows that the Plaintiff's oxygen saturation during the Relevant Time Period fluctuated between 90% and 96%, producing a slightly below-normal

average reading of 93.33%.  *See* R. 339-47.  Based on this diagnostic evidence, the Plaintiff contends that his oximetry readings were not "usually" normal, as the ALJ had reasoned.  However, to the extent the Plaintiff suggests that this discrepancy materially erodes the evidentiary basis for the ALJ's decision, the Court disagrees.

It is apparently true that, during the Relevant Time Period, the Plaintiff, on average, registered a below-normal oxygen saturation level. However, the Court finds it to be relevant that additional oximetry testing was performed immediately prior to the Relevant Time Period – namely, during the final six months of the Plaintiff's employment, when he claims he experienced dizziness and daytime sleepiness due to low oxygen levels.  However, those tests revealed normal oxygen saturation of 97%.

Also, a sampling of oximetry readings taken at semiregular intervals throughout the Relevant Time Period – namely, on December 4, 2006; February 13, 2007; May 16, 2007; and March 25, 2008 – reveal consistently normal oxygen levels between 95% and 96%.

Contrary to the Plaintiff's contentions, it appears that the below-normal median of the available oximetry readings is anchored, in substantial part, by a flurry of testing performed during a relatively brief period from December 12, 2006 to February 2, 2007.  During this approximately seven-week period, three separate oximetry tests showed oxygen saturation levels between 90% and 92%.  However, almost immediately thereafter, on February 13, 2007, the Plaintiff's levels returned to normal, namely, 95%.

In this regard, there appears to be no evidence or legal authority to support the conclusion that an average blood saturation level that is two percentage points below normal is sufficient to compel a finding that a claimant lacks the functional capacity to perform medium work.

In any event, in the Court's view, the slightly below-normal average of the Plaintiff's oximetry readings is not necessarily representative of his true condition during the Relevant Time Period.   On the contrary, the results of the oximetry testing, viewed as a whole, are consistent with,

and provide reasonable support for the ALJ's statement that the Plaintiff's oxygen levels were usually normal. *See Cichocki*, 729 F.3d at 178 n.3 (noting that the substantial evidence standard is satisfied where the record as a whole permits the Court to glean the rationale of the ALJ's decision). This is particularly true given that the oximetry testing was one of several objective measures – in addition to physical examinations, chest auscultation, and pulmonary function testing – that the ALJ, drawing on Dr. Rabinowitz's treatment records, relied upon in reaching his ultimate conclusion that the Plaintiff was not disabled under the Act.

Further, the ALJ's decision is consistent with the Workers' Compensation forms submitted by Dr. Rabinowitz throughout the Relevant Time Period, in which he never indicated that the Plaintiff was completely disabled. On the contrary, on February 16, 2007 – approximately eight months after the alleged disability onset date – Dr. Rabinowitz submitted a form to the Workers' Compensation Board stating that the Plaintiff was *not* disabled from performing his regular duties as a crane operator. In a series of similar forms submitted during the Relevant Time Period, Dr. Rabinowitz invariably stated that the Plaintiff was partially, not completely disabled.

Further, the Commissioner contends, and the Plaintiff does not dispute, that even Dr. Rabinowitz's indication that the Plaintiff was partially disabled for purposes of Workers' Compensation benefits is not determinative in this appeal because the standard for what constitutes a "disability" under the Social Security Act is more stringent. *See* Comm. Reply Br. at 2 (citations omitted); *see DeJesus v. Chater*, 899 F. Supp. 1171, 1177 (S.D.N.Y. 1995) (noting that "[t]he issue [in a civil appeal of the Commissioner's denial of disability benefits] is whether a person is disabled as that term is defined under the Social Security Act, not whether a person is 'disabled' or 'partially disabled' for purposes of workers' compensation").

The ALJ's evaluation of the treating source records, and his RFC determination, are also consistent with the Plaintiff's hearing testimony. In particular, the Plaintiff testified that he had

never been hospitalized or visited the emergency room for any asthma-related symptoms. He walked without a cane; cooked and cleaned; performed the household shopping; did the laundry; did the dishes; took out the garbage; swept and mopped the floors; and sometimes made the beds. He showered by himself; dressed himself; used a telephone and a computer; drove; went to the bank and the post office; used ATMs; and paid the bills. At the time of the hearing, the Plaintiff admittedly was under no stress or strain, and stated that he "still [could] function and work with people."

In support of his claim for benefits, the Plaintiff relies heavily on Dr. Rabinowitz's narrative reports of July 2008 and April 2010, in which he apparently concludes that the Plaintiff was completely disabled. However, the Court finds that the ALJ did not err in according little weight to these opinions – both of which were prepared *after* the Relevant Time Period – as they were clearly inconsistent with Dr. Rabinowitz's own treatment records, clinical findings, conservative course of recommended treatment, and repeated submissions to the Workers' Compensation Board during the Relevant Time Period.

In particular, neither of Dr. Rabinowitz's later narrative reports identifies any additional clinical findings discovered after the Plaintiff's last office visit in March 2008. Therefore, the conclusion that the Plaintiff "remains completely disabled" is plainly inconsistent with the medical evidence, which previously warranted only findings of being partially disabled or not disabled at all.

Dr. Rabinowitz's opinions were also inconsistent with the findings of the consultative examiner, Dr. Wahl. During an internal medicine evaluation, Dr. Wahl noted that the Plaintiff's asthma was asymptomatic; that he was in no acute distress; and that he displayed an ability to perform a wide range of physical tasks, including walking on his heels and toes without difficulty; squatting fully; ambulating without an assistive device; getting on and off the exam table without help; and rising from a seated position without difficulty. Similar to Dr. Rabinowitz's physical examinations, Dr. Wahl observed the Plaintiff's chest and throat to be clear. With respect to the Plaintiff's ability to lift and/or carry objects, Dr. Wahl's physical examination revealed full muscle

strength in the Plaintiff's extremities; no muscle atrophy; no motor or sensory deficits; and full fine motor activity in his hands. The only exertional limitation recommended by Dr. Wahl was the avoidance of "intensely strenuous exercise."

The Plaintiff argues that Dr. Wahl's recommendation that he avoid "intensely strenuous exercise" actually supports his position because "intensely strenuous exercise" necessarily includes the performance of medium work. However, this conclusion appears to be based solely on the lay opinion of the Plaintiff's counsel, and is unsupported by evidence in the record or pertinent legal authority. *See* Pl. Br. at 20 (stating, without authority, "[w]e submit that medium work . . . certainly includes strenuous exertion and it would be intensive at times"). In the Court's view, this contention provides an insufficient basis for challenging the ALJ's decision.

Further, the Plaintiff argues that Dr. Wahl's opinion is entitled to limited weight because the term "intensely strenuous exercise" is impermissibly vague, and does not provide a valid basis for the ALJ's RFC determination. The Court disagrees.

In making his point, the Plaintiff mischaracterizes caselaw that he contends exemplifies the Second Circuit's generally "critical" view of "vague" terminology by non-treating physicians. *See* Pl. Reply Br. at 3. However, in the Court's view, the cases relied upon by the Plaintiff are distinguishable from the facts of this case and do not support the relief sought.

For example, contrary to the Plaintiff's contentions, in *Selian v. Astrue*, 708 F.3d 409 (2d Cir. 2013), the court did not express across-the-board skepticism of vaguely-worded medical opinions. Instead, on the facts of that case, it held that the medical opinion at issue, namely, that the claimant "should be able to lift . . . objects of a mild degree of weight on an intermittent basis," was "remarkably vague" because it left the meanings of the terms "mild degree" and "intermittent" to the "sheer speculation" of the ALJ. Thus, the court found that this opinion did not lend substantial support for the ALJ's specific determination that the claimant could lift up to 20 pounds occasionally and 10 pounds frequently. In particular, among other things, the court noted that the

ALJ's conclusion, which was based solely on the questionable medical opinion, had been contradicted by the claimant's own testimony that his fibromyalgia prevented him from carrying even an eight-pound gallon of milk.

By contrast, unlike in *Selian*, the ALJ in this case did not base his RFC determination, namely, that the Plaintiff could perform the exertional demands of medium work, solely on Dr. Wahl's recommendation that he avoid only "intensely strenuous exercise." On the contrary, as discussed above, the ALJ's findings were supported by other substantial evidence in the record, including the Plaintiff's treating source records; diagnostic evidence; and the Plaintiff's own testimony regarding his exertional capabilities. Although the ALJ apparently accepted Dr. Wahl's recommendation that the Plaintiff avoid "intensely strenuous exercise," as noted above, there does not appear to have been any evidence or other authority to compel the ALJ to conclude that the Plaintiff was therefore precluded from medium work.

The Court is similarly unpersuaded by the Plaintiff's reliance on the matters of *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008) and *Curry v. Apfel*, 209 F.3d 117 (2d Cir. 2000), which the Plaintiff cites for the proposition that a medical expert's opinion may be given diminished weight where it is " 'so vague as to render it useless in evaluating' the claimant's residual functional capacity." *See Burgess*, 537 F.3d at 128-29 (quoting *Curry*, 209 F.3d at 123). In this case, the Court finds that Dr. Wahl's recommendation that the Plaintiff avoid "intensely strenuous exercise" is not so vague as to render it, or his broader medical opinion, useless. Nor did the ALJ commit error by according Dr. Wahl's opinion considerable weight, as it was largely consistent with the objective evidence in the record, including Dr. Rabinowitz's treatment records from the Relevant Time Period.

Accordingly, in view of the record as a whole, the Court finds that, to the extent the Underlying Decision found the Plaintiff capable of meeting the exertional demands of medium work during the Relevant Time Period, it was supported by substantial evidence.

**C.    As to Whether Substantial Evidence Supported the ALJ's Determination that the Plaintiff Could Have Performed Medium Work Jobs that Existed in Significant Numbers in the National Economy**

The second issue in this case is whether substantial evidence in the record supported the ALJ's conclusion that, given the Plaintiff's RFC, age, education, and work experience, there were medium work jobs that existed in significant numbers in the national economy that he could have performed during the Relevant Time Period.

**1.    The Applicable Law**

As noted above, under the relevant five-step sequential analysis, it is the Commissioner who bears the burden of showing that, "in light of the claimant's RFC, age, education, and work experience, the claimant is 'able to engage in gainful employment within the national economy.' " *Felix*, 2012 U.S. Dist. LEXIS 102949, at *19 (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997)).  Also, as discussed above, the Commissioner generally carries this burden by relying on the Grids to determine whether a claimant can engage in any other substantial gainful work which exists in the national economy.  *See Samuels*, 2003 U.S. Dist. LEXIS 8173, at *36.

However, exclusive reliance on the Grids is not appropriate in all cases.  "Generally speaking, if a claimant suffers only from exertional impairments, *e.g.*, strength limitations, then the Commissioner may satisfy her burden by resorting to the applicable [G]rids." *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996).  But, "exclusive reliance on the [G]rids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations." *Rosa*, 168 F.23 at 78; *see Heckler v. Campbell*, 461 U.S. 458, 462 n.5, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983) (observing that the Grids will only be applied where they accurately describe a claimant's abilities and limitations).  For example, as in this case, " 'sole reliance on the [G]rid[s] may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of [ ] work that the claimant can perform.' " *Id.* (quoting *Bapp*, 802 F.2d at 603).

As noted above, "[a] 'nonexertional impairment' is defined as a limitation or restriction which 'affect[s] [a claimant's] ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting standing, walking, lifting, carrying, pushing or pulling are considered nonexertional.'" *Baker v. Apfel*, No. 97-cv-757, 1998 U.S. Dist. LEXIS 15444, at *4 n.3 (W.D.N.Y. Aug. 10, 1998) (quoting 20 C.F.R. § 416.969a(a)). Examples of nonexertional limitations include "mental . . . impairments" or "environmental restrictions such as 'difficulty tolerating dust or fumes' due to asthma." *Williams v. Astrue*, No. 09-cv-3997, 2010 U.S. Dist. LEXIS 130273, at *41 (E.D.N.Y. Dec. 9, 2010) (quoting *Burgos v. Barnhart*, No. 01-cv-10032, 2003 U.S. Dist. LEXIS 14407, at *51 (S.D.N.Y. Aug. 30, 2003)).

Where, as here, a claimant has both exertional and nonexertional limitations, the Grids are merely to be used as a framework in the disability determination, and the "ALJ 'must consider and address on the record the combined effects of the claimant's exertional and non-exertional limitations and the advisability of additional testimony before resorting to the [Grids]." *Id.* at *43-*44 (quoting *Nigino v. Astrue*, No. 04-cv-3207, 2009 U.S. Dist. LEXIS 27595, at *15 (E.D.N.Y. Mar. 30, 2009)); *see Jerome v. Astrue*, No. 08-cv-98, 2009 U.S. Dist. LEXIS 104374, at *32 (D. Vt. Nov. 6, 2009) (noting that "where nonexertional limitations are involved, the ALJ must 'go beyond the grid[s]' and 'make findings relating to the severity of [the claimant's] nonexertional limitations and the effects of such limitations on [the claimant's] residual functional capacity before making a determination granting or denying benefits'" (quoting *Munks v. Heckler*, 580 F. Supp. 871, 874-75 (N.D. Ill. 1984))).

If the ALJ finds that the claimant's nonexertional limitations "significantly diminish the range of work the claimant can perform," he "must hear testimony from a vocational expert or seek out similar evidence that that there are jobs 'in the national economy which the claimant can obtain and perform.'" *Williams*, 2010 U.S. Dist. LEXIS 130273, at *44 (quoting *Nigino*, 2009 U.S. Dist. LEXIS 27595, at *15). For purposes of applying this standard, "[t]he range of work is significantly

restricted by nonexertional limitations when a claimant suffers an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him [or her] of a meaningful employment opportunity.' " *Id.* (quoting *Bapp*, 802 F.2d at 606).

2. **The ALJ Erred in Failing to Expressly Consider Whether the Plaintiff's Nonexertional Limitations Significantly Diminished the Range of Medium Work that He Could Perform**

It is the opinion of the Court that the ALJ failed to appropriately consider the Plaintiff's nonexertional limitations, and their impact, if any, on the range of medium work jobs the Plaintiff could obtain and perform, before directly applying the Grids to make a disability determination.

The Plaintiff contends that the ALJ's direct reliance on the Grids, which mandated a finding that he was not disabled, was improper because the Plaintiff's nonexertional limitations – that is, his need to avoid dust and respiratory irritants; to perform low stress work; and to limit contact with supervisors, coworkers, and the public – substantially diminished the number of medium work jobs that he could realistically perform.

Thus, the question presented is whether substantial evidence in the record supported the ALJ's determination that, during the Relevant Time Period, the Plaintiff's nonexertional limitations did not significantly diminish the range of medium work he could have performed. The Court answers this question in the negative.

A review of the Underlying Decision reveals an insufficient effort on the part of the ALJ to develop the record and address this aspect of the required analysis. In particular, the ALJ determined that the Plaintiff retained the functional capacity to meet the exertional demands of medium work, while directly acknowledging that he "should avoid respiratory irritants and can perform low stress work, which includes limited contact with supervisors, co-workers and the public." R. 415. However, at the final step of the sequential analysis, the ALJ did not consider at all whether the Plaintiff's nonexertional limitations were likely to compound his exertional

impairments to such a degree as to materially diminish the range of work he could perform. Instead, the ALJ directly applied the Grids to arrive at a finding of not disabled:

> [During the Relevant Time Period], considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).
>
> . . . When the claimant . . . has nonexertional limitations, the medical-vocational rules [Grids] are used as a framework for decision-making . . . If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making (SR 85-15).
>
> Based on a residual functional capacity for the full range of medium work, the undersigned concludes that, through the date last insured, considering the claimant's age, education, and work experience, a finding of "not disabled" is directed by Medical-Vocational Rule 203.15 and Rule 203.17.

R. 418-19.

The Court agrees with the Plaintiff that this was improper. *See* Pl. Br. at 22 (arguing that the ALJ erroneously "accepted the [nonexertional] limitation but offered no analysis of why it would have no impact on the medium workbase").

In reaching this conclusion, the Court reiterates that where, as here, a claimant has both exertional and nonexertional limitations, the ALJ *must* consider and address *on the record* the combined effects of the claimant's exertional and nonexertional limitations, and the advisability of additional testimony *before resorting to the Grids. See Williams*, 2010 U.S. Dist. LEXIS 130273, at *43-*44. If, after performing this antecedent analysis, the ALJ finds that the claimant's nonexertional limitations do, in fact, significantly diminish the range of potential work, he *must* hear testimony from a vocational expert or seek out similar evidence regarding the amount of jobs in the national economy which the claimant can reasonably obtain and perform. *See id.* at *44.

In this case, despite noting multiple nonexertional limitations, the ALJ apparently did not consider, and certainly did not address on the record, their compounding effect, if any, on the Plaintiff's exertional impairments. Nor did he indicate whether the combined effect of these

impairments significantly diminished the Plaintiff's range of potential work, or the advisability of eliciting additional evidence on that subject before resorting to the Grids. Thus, the ALJ never reached the question of whether vocational testimony or other similar evidence should have been introduced to determine whether the Plaintiff's nonexertional limitations so narrowed his possible range of work as to deprive him of a meaningful employment opportunity.

A similar situation was presented in *Williams*, No. 09-cv-3997, 2010 U.S. Dist. LEXIS 130273 (E.D.N.Y. Dec. 9, 2010), where, after finding that the claimant maintained the functional capacity to meet the exertional demands of light work, the ALJ directly relied on the Grids to find her not disabled. On appeal, the district court (Matsumoto, J.) found that, as here, the claimant's nonexertional limitations had been well-documented in the record. However, despite recognizing that, in the presence of nonexertional limitations the Grids are merely advisory, the ALJ nevertheless failed to explicitly consider whether the claimant's nonexertional limitations significantly diminished the range of work that she could perform. Further, to whatever extent the ALJ did find that the claimant's nonexertional limitations diminished her range of work, "he erred by failing to identify or include evidence in the record, via testimony from a vocational expert or a similar source, that a significant number of jobs that plaintiff could perform exist[ed] in the national economy." 2010 U.S. Dist. LEXIS 130273, at *75-*76. As set forth above, in the Court's view, a similar result is warranted here.

The Court further notes that, with respect to an appropriate remedy, the Plaintiff argues in favor of reversing the Underlying Decision and adjudging him "disabled" under the Act for the Relevant Time Period. He contends that the Court should not remand this matter for any additional proceedings. However, it is well-settled that "application of the grid guidelines and the necessity for expert testimony must be determined on a case-by-case basis," *Bapp*, 802 F.2d at 605, and whether a claimant's impairments significantly diminish his employment opportunities is not a question for

the district court on appeal, but "is a determination that must be made on the record by ALJ," *Williams*, 2010 U.S. Dist. LEXIS 130273, at *78 (citing *Nigino*, 2009 U.S. Dist. LEXIS 175295, at *15).

Thus, in *Williams*, the court remanded the matter for the ALJ to "determine on the record . . . whether the effects of all of plaintiff's nonexertional limitations preclude reliance on the Grid[s]," and, "[t]o the extent the ALJ determines that the nonexertional limitations significantly diminish plaintiff's employment opportunities, [to] introduce evidence into the record, via testimony from a vocational expert or a similar source, that a significant number of jobs that plaintiff could perform exist in the national economy." *Id.* at *79; *see also Bapp*, 802 F.2d at 606 (finding that the ALJ failed to adequately consider whether the range of work the claimant could perform "was so significantly diminished as to require the introduction of vocational testimony" and thus directed a remand in order for the ALJ to (i) reevaluate whether the claimant's capability to perform the full range of light work was significantly diminished by his nonexertional limitations, and if so, then (ii) require the Commissioner to sustain her burden of proof through the testimony of a vocational expert or other similar evidence regarding the existence of jobs in the national economy within the claimant's limitations). Under the facts and circumstances of this case, the Court finds remand to be appropriate and warranted.

Accordingly, the Court finds that the portion of the Underlying Decision which found that there were jobs that existed in significant numbers in the national economy that the Plaintiff could have performed was not supported by substantial evidence in the record. The Court further finds that remand for additional administrative findings consistent with this opinion, and not outright reversal, is the appropriate remedy.

### III.   CONCLUSION

Based on the foregoing, the Court grants in part and denies in part the Plaintiff's motion under Fed. R. Civ. P. 12(c) for judgment on the pleadings; and grants in part and denies in part the Commissioner's analogous cross-motion.

In particular, the Court finds that the portion of the Underlying Decision which found the Plaintiff to be capable of meeting the exertional demands of medium work during the Relevant Time Period was supported by substantial evidence in the record.

However, the portion of the Underlying Decision which found that there were jobs that existed in significant numbers in the national economy that the Plaintiff could have performed was unsupported by substantial evidence in the record.

Accordingly, the ALJ's February 6, 2013 decision is vacated in part, and this matter is remanded for additional administrative proceedings to determine, and address on the record, whether, during the Relevant Time Period, the Plaintiff's capability to perform the full range of medium work was significantly diminished by the combined effects of his exertional and nonexertional limitations. If so, the ALJ is directed to develop the record with a view toward eliciting proof, through the testimony of a vocational expert or other similar source, regarding the existence of jobs in the national economy that an individual with the Plaintiff's impairments and limitations, both exertional and nonexertional, could reasonably be expected to obtain and perform. Finally, after conducting this analysis, the ALJ is directed to reevaluate whether a departure from the Grids is warranted in determining the Plaintiff's disability status.

The Clerk of the Court is respectfully directed to close this case.

It is **SO ORDERED.**

Dated:        Central Islip, New York
                August 8, 2016          */s/ Arthur D. Spatt*               
                                          ARTHUR D. SPATT
                                          United States District Judge